IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 5, 2021

## STATE OF TENNESSEE v. DAMIAN MCGLOWN a/k/a DAMION MCGLOWN

**Appeal from the Criminal Court for Shelby County**
No. 17 03179      Glenn Ivy Wright, Judge

_____

**No. W2020-01327-CCA-R3-CD**

_____

Following a jury trial, Damian McGlown,[1] Defendant, was convicted of one count of aggravated rape for "unlawfully, knowingly, or recklessly sexually penetrat[ing] and caus[ing] bodily injury" to his adult niece, and he was sentenced to seventeen years' incarceration. On appeal, Defendant claims that the evidence failed to show that Defendant caused bodily injury to the victim and, therefore, was insufficient to support his conviction of aggravated rape. Discerning no error, we affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Patrick E. Stegall (on appeal) and Jason Ballenger (at trial), Memphis, Tennessee, for the appellant, Damian McGlown a/k/a Damion McGlown.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Lessie Rainey, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] Defendant's first name is spelled Damian, Damion, or Damien at different places in the record. The indictment and judgment of conviction have Damian McGlown. Defendant's numerous pro se motions were submitted under the name "Damion McGlown, Grantor, as a Secured Party Signature," and signed Damion McGlown as "Agent" by "Power of Attorney in fact with the Autograph." In his brief, Defendant is referred to, in error, as Damien McGlowan or Damien McGowan. We will use the name as it appears in the indictment and judgment of conviction, Damian McGlown, and note that he is also known as Damion McGlown.

# OPINION

## Jury Trial

The victim testified that she lived with other family members and Defendant in a four-bedroom house. On November 7, 2016, the victim's father picked her up at work between 11:00 p.m. and midnight. On the way home, they stopped at a gas station, and her father bought her a Lime-A-Rita, some cigarettes, and some "cigar wraps." When they got home, she and her father smoked marijuana, and she drank about half of the Lime-A-Rita.

The victim said that she slept on the chaise lounge in the living room. She said that her dad and stepmother slept in one bedroom, her stepsister in a bedroom across from her parents, her cousin in another bedroom, and Defendant in a bedroom that had been converted from a carport. She said that she was upset because she had broken up with her boyfriend, so she called a friend, and they talked for about an hour and a half before she went to bed. She was wearing a tee-shirt and underwear and sleeping on her stomach when she awoke and found Defendant on top of her. She said that Defendant pushed her underwear aside and penetrated her vagina with his penis. The victim said that it hurt and that she woke up screaming. She said that, when she managed to get out from underneath Defendant, Defendant "jumped up in the doorway, grabbed [her], told [her] to shush and then asked what [she] was doing." She ran "past him, down the hallway, screaming." The victim stated that her stepsister, dad, and stepmom came out of their rooms. She said that Defendant was "[r]ight behind [her], pulling up his pants." She said that she pushed past her parents and went into their bedroom. Her parents followed, and she told them that Defendant raped her. She said that Defendant was "at their bedroom door still messing with his pants and belt." Defendant "said something like, he didn't have nothing to do with it and he was going to get cigarettes." Defendant left the home. The victim said that her dad then left "to go call" Defendant, leaving her in the bedroom with her stepmother and stepsister. She said that she "snuck into the bathroom," locked herself in, and called 9-1-1. The operator told her to remain in the bathroom and not to take a shower or use the bathroom.

The victim said that Defendant returned to the house about the same time the police arrived and that he was arrested. She was transported to the Memphis Sexual Assault Resource Center and examined by a nurse. The nurse took swabs of her vagina. The victim said that the injuries to her vagina were painful. She was then taken to the police station where she gave a statement and identified Defendant in a photographic array.

The victim's stepmother testified that, on the night of the offense, she "woke up to screaming" and recognized the victim's voice. She opened the bedroom door and saw the

victim as she came down the hall with Defendant behind her. She said that the victim "was pretty much hysterical, you know, she was crying, she was upset[,] and she was physically, like, shaking." The victim's stepmother said that she tried "to console [the victim], but [that the victim] kind of got agitated and she went into the bathroom" and "we couldn't get her out." She said that the victim called 9-1-1 from the bathroom and that Memphis Police Department officers arrived approximately thirty minutes later.

Memphis Police Department (MPD) Officer Dexter Walker was on "uniform patrol" when he was dispatched to the location of the victim's 9-1-1 call. He spoke with the victim, and when Defendant returned to the residence, he placed Defendant in custody. His partner transported Defendant to the police station, and Officer Walker transported the victim to the Shelby County Crime Victims & Rape Crisis Center (the Rape Crisis Center). When the sexual examination was completed, he "tagged" the rape kit and delivered it to the property and evidence room at MPD.

MPD Sergeant Marcus Tucker testified that he was assigned to the sex crime unit in 2016. He became involved in the case after Defendant had been transported to the police station. He advised Defendant of his *Miranda* rights, and Defendant agreed to speak to Sergeant Tucker. Defendant signed a consent form for collection of buccal swabs to provide DNA. Sergeant Tucker questioned Defendant and recorded the interview. He said that Defendant's answers were "recorded exactly" as Defendant gave them. He asked Defendant what happened on November 8, 2016, and Defendant responded:

> I heard my niece, [the victim], crying in the living room, about 3:30 a.m. I got up and sat with her, an hour later she began to go to sleep[,] and I arose from the couch where I was sitting, I guess I scared her. After that once I heard her talking to her father I left and went to the store, I came back about five minutes before the police got there.

When asked if he touched the victim, Defendant responded that "[he] patted her on the back, when she was crying, [he] rubbed her shoulders and [he] held her hand." When asked if he touched her in a sexual manner at any time, Defendant answered, "No, sir, not to my knowledge."

MPD Sergeant Mark Lesure testified that he assisted Sergeant Tucker with the investigation. He said that, while speaking to Defendant, he created a "supplement" so that he could refer back to what was said and what occurred. He said that Defendant gave him his version of the events and that he asked Defendant to physically demonstrate what happened in the living room. He said that Defendant demonstrated how he was lying on the couch next to the victim and how he rubbed the victim's shoulders. Defendant also

showed "us how he placed his hands on her buttocks to get up." He said that she was screaming when he got up and that he "put his hands over her mouth, because he didn't want to wake everybody else up in the house."

MPD Officer Linsey Flores testified that she is a "criminalist" and that her job was to collect DNA and other evidence related to sex crimes. She obtained buccal swabs from inside Defendant's left and right cheek. She later transported the victim's sexual assault kit and the swabs from Defendant to the Tennessee Bureau of Investigation (TBI) crime lab.

Kristine Gable, the nursing coordinator for sexual assault nurse examiners at the Rape Crisis Center, testified as "an expert in the field of sexual assault examinations." Nurse Gable examined and photographed the victim's body and prepared "a rape kit for the lab to use for their testing." Nurse Gable stated that, per CDC recommendations, the victim was given emergency contraception so that she would not get pregnant and given three antibiotics to prevent gonorrhea, chlamydia, and trichomonas. Nurse Gable took the following history from the victim:

> Twenty[-]year[-]old female reports she was asleep on the couch at home when she woke up screaming to her paternal uncle, [Defendant], forcing unprotected penile/vaginal penetration, unknown ejaculation. Patient states, it hurt. She reports he was holding her down and [she] tried to get up and he grabbed [her] arms. [She] got up and he grabbed [her] by [her] arms again. He said, Shhh, [she] went screaming and ran down the hall to [her] step[]mom and step[]sister. [Her] step[]mom woke up [her] dad and he started asking [her] questions. [Her] uncle took off and left the house, they didn't call the police. [Her] step[]mom took [her] step[]sister to work and [her] dad went looking for [Defendant]. Patient reports she called the police, herself.

Nurse Gable took photographs to document three lacerations that she observed during the physical exam. She opined that, when injuries to the genitals can be observed, "they usually stem from blunt force penetration." Nurse Gable described the victim's injuries as "tender to touch." After reviewing the photographs, Nurse Gable determined that the victim actually had a total of five superficial lacerations—two to the fascia-vicularis, one to the posterior fourchette, and two to the perineum. Buccal, vulval, and vaginal swabs were taken from the victim during the examination.

TBI forensic scientist Chad Johnson generated DNA profiles for the victim and Defendant. He said that the profile from the vaginal swabs contained a mixture of two individuals. He said that, when he eliminated the victim's profile, he "had a profile that

- 4 -

matched [Defendant]." He said that he would not expect anyone else in the world population to have that profile.

Based on the evidence submitted at trial, the jury found Defendant guilty of aggravated rape. Following the denial of his motion for new trial, Defendant timely appeals.

**Analysis**

Defendant claims that the evidence was insufficient to prove that he caused bodily injury to the victim and, therefore, does not support a conviction for aggravated rape. The State argues that the evidence is sufficient to support the conviction. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged in the indictment, "[a]ggravated rape is unlawful sexual penetration of a victim by the defendant" where the "defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(2) (2016). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2) (2016). "This Court has previously held that a scratch, an abrasion, a small bruise, a laceration, and the physical pain caused by vaginal penetration constitute 'bodily injury' within the

meaning of the statute." *State v. Smith*, 891 S.W.2d 922, 927-28 (Tenn. Crim. App. 1994) (footnotes omitted). The State must present adequate evidence of bodily injury for a rational jury to determine beyond a reasonable doubt that the victim suffered bodily injury. *State v. Norman McDowell*, No. W2014-00301-CCA-R3-CD, 2015 WL 554873, at *5 (Tenn. Crim. App. Feb. 10, 2015).

In this case, there was adequate proof for a rational jury to determine beyond a reasonable doubt that the victim suffered bodily injury. During the examination, Nurse Gable observed lacerations to the victim's "fascia-vicularis and posterior fourchette" that she described as "tender to touch." The victim testified that it hurt when Defendant penetrated her. At trial, Nurse Gable testified that the victim had five lacerations and that, when such injuries to the genitals can be observed, "they usually stem from blunt force penetration."

## Conclusion

The evidence, when viewed in the light most favorable to the State, is sufficient to support Defendant's conviction for aggravated rape beyond a reasonable doubt. The judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE